THE GLADIATOR CONSOLIDATED GOLD MINES AND MILLING COMPANY, Appellant, v. A. L. STEELE, Appellee.

**Principal and agent:** ACCOUNTING: BURDEN OF PROOF. One employed to look after the correspondence and business of a corporation and to make sales of its stock, who also undertakes and pretends to keep an account showing the company's receipts and disbursements, has the burden of accounting for all moneys of the corporation so received, or of making a satisfactory explanation for not so doing.

**Appeal:** REVIEW OF FINDING: CONFLICTING EVIDENCE. Where the evidence is conflicting on an issue as to whether drafts belonging to a corporation were cashed by the bookkeeper and the proceeds turned over to the treasurer without any record thereof being made on the books of the company, a finding by the trial court that the books of the company were not conclusive as to the state of the accounts between the bookkeeper and the corporation is sustained.

**Principal and agent:** SALE OF CORPORATE STOCK: RIGHTS OF AGENT. Although the agent of a corporation employed to sell corporate stock is authorized to dispose of stock issued to him in payment for his services, through company agencies, he has no right to substitute, on an application for corporate stock, that owned and purchased by him as a matter of speculation.

**Accounting by agent:** An agent is required to account for all funds coming into his hands belonging to his principal.

*Appeal from Polk District Court.*—HON. W. H. McHENRY, Judge.

TUESDAY, APRIL 3, 1906.

REHEARING DENIED, NOVEMBER 22, 1906.

SUIT for an accounting resulted in a dismissal of the petition. The plaintiff appeals.— *Reversed.*

*Warren Walker* and *Wm. G. Clark,* for appellant.

*Carr, Hewitt, Parker & Wright* and *A. L. Steele,* for appellee.

LADD, J.— C. H. Crabtree was the owner of certain undeveloped mining properties located in South Dakota. In February, 1900, he caused to be incorporated in that State the " Gladiator Coal Mining & Milling Company," and, as manager and treasurer, began the sale of stock. Later, the directors concluded to establish an office in Des Moines, and Crabtree, either for himself, or in behalf of the company, arranged with the defendant, A. L. Steele, to do " what work for the company he could " without interfering with the practice of his profession as a lawyer. An office next to that of Steele was rented, and in the spring or summer of the same year his employment commenced. In January, 1901, Crabtree also caused to be incorporated the " Red Cloud Mining & Milling Company," and two months later another corporation known as the " Gold Fish Mining & Milling Company." Stock to the amount of $1,000 par value in each of the last two companies was issued to Steele, and he was named as a director in each, Crabtree, as manager and treasurer, and M. K. Erwin, as assistant secretary. Crabtree transferred a large block of stock in each of these companies, to be sold through the office as treasury stock; the proceeds of which were to be used for the purpose of developing the properties. In January, 1902, these companies were consolidated, for all practical purposes, under the name of the " Gladiator Consolidated Gold Mines & Milling Company," capitalized at $4,100,000. This was accomplished by amending the charter of the first-mentioned corporation, and issuing stock therein in the place and stead of that issued in the other companies, the latter being retired. Steele's employment continued until July 29, 1903. In February and March, 1904, the books, papers, and correspondence of the Des Moines office were examined by an expert accountant, C. P. Worthington, who reported that

there appeared to have been received during the period of Steele's employment, after December 10, 1900, $53,679.23 of which $38,977.04 had been deposited in the Central State Bank, to which should be added sundry items amounting to $328.27 and $8,180.42 paid to or retained by agents, and that the sum of $6,184.50 had not been accounted for. The theory of plaintiff's claim is that Steele, owing to the character of his employment, should be charged with this amount.

The receipts of the office were solely from the sale of stock in the different companies; the accounts of which, owing to their consolidation, need not be separately considered. Steele, as the evidence shows conclusively, handled all of the moneys coming into the Des Moines office, except during his occasional absence, when this was done by Miss Erwin. He alone was authorized by Crabtree to indorse and collect drafts, checks, orders, and the like in favor of the company or of Crabtree as treasurer. Though money may have been paid to Crabtree, no claim is made that he individually indorsed or took from the mails anything coming to this office, and if Miss Erwin indorsed any of the drafts it was on Steele's authority, for there is nothing in the record to indicate that she was authorized by any one else to do so. The funds then came into Steeles' hands, and the burden is cast upon him to account therefor or present a satisfactory excuse for not so doing. The report does this, save the shortage found, which was not arrived at by merely striking a balance, but, as said by the accountant, it " shows the specific items that go to make up the cash shortage of $6,184.50." Of this amount $4,827.86 appears on the books to have been received, but items aggregating $1,356.64, were not entered, and in some instances the correspondence with reference thereto was not to be found within the files of the office. To meet this situation the defendant contends (1) that he was not a bookkeeper, and did not undertake to keep the books; (2) that a large number of items were entered on the books as cash, which was never received; (3) that

drafts were cashed at Crabtree's instance without being entered, and the proceeds either turned over to him or used in paying the expenses of the office.

Doubtless Steele was not a professional bookkeeper.    He did understand the principles of keeping accounts correctly, which according to the accountant, is to "simply

1. PRINCIPAL AND    debit what you receive and credit what you
AGENT:
accounting:    pay out."    He had kept a set of books in a
burden of
proof.    stone business and admitted having been "accused of writing a fair hand," and that he had "studied the system of double entry bookkeeping a little bit."    That he had a proper conception of what was required appears conclusively from this record, and from his testimony "that these books were kept for the company in charging everything to cash and crediting everything to cash, which would keep the affairs of the company straight.    If you keep the company account correct, charging everything to the treasurer that comes in for the company, and crediting the treasurer with everything paid out, all you have to do is to strike a balance, and you have got what belongs to one or the other.    Q. What was the purpose of keeping an account between the company and Crabtree, as treasurer of the company?    What Crabtree paid out as treasurer would be paid out by the company, would it not?    A. Well, you have to keep some account somewhere.    I do not think there was much occasion for keeping any account at all, but my idea was this:    Realizing the difficulties we had to undergo, we could, at least, keep the company's affairs straight by charging everything to cash, and crediting everything to cash, and all Mr. Crabtree had to do to find out his relation, and strike a balance  .  .  .    When I charge money that comes in as being received to the credit of Crabtree, as treasurer, and then credit the company with money paid out, with money that comes from Crabtree, individually, I think those make a legitimate offset so far as the treasurer's account is concerned.  .  .  .    To get the relation between Crabtree

as treasurer and individual, all you had to do was to strike a balance. If he had out more than he got in, the company owed that. If he paid out less than he got in, he owed the company. . . . I regarded the books simply as a memorandum between himself and the company, and I charged him with all cash that came to the company from any source, and credited him with the cash that was paid out for any purpose."

The record fully establishes his competency as a bookkeeper, and had these books been kept as he indicated, there would have been no unexplained discrepancies in the final adjustments of his accounts. It may be, as he testified, that when he was first employed nothing was said concerning the work he should do. Notwithstanding this fact, he took charge of the Des Moines office and of the books, received the funds as they came in and attended to the correspondence precisely as Crabtree testified he had agreed to do. Having undertaken to perform certain duties, we shall not take the trouble to determine whether these were definitely agreed upon. It is enough that the parties so construed their understanding, and that he assumed the responsibility of performing the work indicated. Crabtree insists that the set of books was opened on December 10, 1900, at his suggestion, while Steele, though without definite recollection, is under the impression that the honor of discovering the necessity of so doing belonged to himself. The dispute is not material. Steele opened the books on that day, and made all of the entries for some time thereafter. The stenographer, Miss Erwin, had been employed in November, and as the correspondence did not occupy all of her time, she was directed by Crabtree to assist in keeping the books. To this she responded that she was not a bookkeeper, but, with Steele's assistance, undertook to keep some of the accounts. Thereafter, most of the entries in the books were made by her, and according to her story, she worked on the books when not otherwise employed. In a sense Steele had

charge of these books throughout his employment, but he was engaged much of the time in the practice of his profession, and relied on Miss Erwin to do most of the work. Both she and Steele claim they informed Crabtree of the necessity of having an efficient bookkeeper to properly keep the accounts, and that he replied that he thought they could do the work. In any event, the record shows that though Steele understood bookkeeping, most of it was done by Miss Erwin, who was not efficient at such work, and did not make entry of many of the drafts, checks, orders, and the like received at the office, which were also omitted by Steele.

The contention that a large number of items were entered on the books as cash, which never came into the office, is disposed of by the accountant's report. These items were all eliminated, as were also the mine account. With reference thereto, the accountant testi- fied that " none of the transactions between Mr. Crabtree or the mine account would explain the shortage of $6,- 184.50, shown in the report. The shortage arises from other sources than those transactions. There is a list furnished." This list gives the date, the person from whom received, the place of residence, and, in many instances, the form of remittance. Had any of these items been paid to Crab- tree, and a debit of cash entered upon his report without the money, the defendant might easily have so shown. In the absence of any such showing, we must accept the testi- mony of the accountant that all debits when money in some form was not received, were eliminated. According to both Steele and Miss Erwin, the former found much fault with Crabtree, because of his omission of dates and other irregularities in reporting funds received by him person- ally from the sale of stock, and paid out for expenses. Steele seems to have taken great pains to ascertain such items and the expenses at the mine and enter them on the books. Nevertheless, if these witnesses are to be believed, they omitted to enter upon the books the receipt of a large number

2. APPEAL:
review of
finding:
conflicting
evidence.

of drafts which came into their hands, and cashed them, without depositing in the bank or leaving a trace elsewhere of their having been received or paid out. Steele testified that:

> At times our expenses were quite high and we used drafts for the purpose of meeting them. They were cashed and paid out, and these items, many of them, do not appear on the books. There were a number of vouchers; . . . some weeks we had over $100 in postage. We sent out circulars, paid freight, and matters of that character. We cashed drafts, and paid the expenses in currency. We had a place where the cash was kept in the office. That cash was replenished by cashing drafts. Sometimes they were large. Here is one of $137, which I think was used for expenses. . . . Frequently, during the three years I was in the office, we would take drafts down to the bank, and get the money and give it to him [Crabtree] direct. Sometimes there would be no charge made against him. I did that because he wanted money, and if our bank account was low, we would cash a draft, and when the revenue stamps were on, he especially had us cash drafts and save two cents in that way. I would do it by his direction. . . . I cashed drafts frequently during the time he was in there for money for him and small drafts frequently.

This testimony is corroborated by Miss Erwin, who swore that most, not all, of the drafts received were deposited in the bank, that " some were cashed, and the money used in the office. I could not say how frequently that was, but I know different times. That was done under Mr. Crabtree's direction. He would want money or bills paid, and would ask to have them cashed and the money brought into the office. My recollection is that Mr. Crabtree had Steele cash them for him. I could not say how frequently, but know different times when he was going away, and sometimes when there were bills to be paid. He said it was just as well to pay them that way, and asked me to get them cashed. Q. How would you spread that transaction on the books?

A. I do not think it was put on the books at all.    I never had instructions to put that on the books.    I understood anything Mr. Crabtree said to be done must be done, and I tried to do it." Both Steele and Miss Erwin testify that Crabtree's attention was called to the necessity of having a bookkeeper who understood how to keep the accounts.    Also that we both "wanted all money banked and separate accounts kept and everything paid by check; but Mr. Crabtree thought it better to keep everything all together."

Crabtree denied that any draft was ever cashed, and the proceeds turned over to him, that uniformly a check was drawn on the bank and the proceds procured and turned over to him instead to meet expenses.    He testified his instructions were that all moneys received should be deposited in the bank, and not a cent drawn out save by check.    Steele denies this, but did open an account with the bank, and also kept an expense account of the office showing over $7,000 paid out, though checks only were entered therein, and not a single cash item.    But it is to be said in favor of his contention that three drafts, at least, were forwarded to Crabtree at Deadwood, and these advised him that his instructions, if given, were being disregarded.    It would seem that the necessity of entering the receipt of all drafts in payment of stock on the books ought to be apparent to the most unsophisticated.    Yet these witnesses testify that drafts received were so cashed with Crabtree's consent, and no trace whatever kept of record indicating the receipt of the money, or for what purposes the proceeds were disbursed.    Were it not for the findings of the district court, we should be inclined to reject this explanation of the omission of the items from the books.    Very few of over four hundred of these, making up the shortage have been explained by either Steele or Miss Erwin, and neither is able to point out a single instance where the proceeds of a draft were turned over to Crabtree.    Even though the drafts were cashed at Crabtree's instance, he did not direct the omission of the proper

record of their receipt and disbursement. Steele, as an attorney, must have been aware of Crabtree's obligation to account to the corporation, and hence the necessity of keeping accurate books. Miss Erwin, whose integrity is not questioned by either party, did not recall ever having seen money received on drafts paid to Crabtree, but testified that he often requested drafts to be cashed and the money turned over to him. Possibly she confused the payment of the proceeds of checks, which Crabtree admits, with those of drafts. However, these witnesses were before the district court, as were also the books and vouchers introduced in evidence, and in view of its superior advantages in the investigation and also the numerical support of witnesses, a majority of the members of this court are not inclined to disturb district court's findings that drafts when cashed were customarily omitted from the books, and that cash was obtained on them at the instance of Crabtree instead of depositing them in the bank. So the books, then, cannot be accepted as fixing the liability of defendant.

Not all of the items of the shortage are accounted for by the testimony that the drafts were cashed and proceeds used for the benefit of the company. Some items belonging to the company are shown to have been misappropriated by Steele, though possibly without intention of wrong doing, a point not decided, for if he took money belonging to the company, his intention with reference thereto is not material in determining his liability. The office had been established for the sale of treasurer's stock. No other was put on the market. The purpose of Steele's employment was to aid in accomplishing this object. In receiving mail addressed to Crabtree, as treasurer, and indorsing his name, as such, or that of the company, he was acting as agent of Crabtree or the company, and not for himself. Accordingly, when the order for four hundred shares of stock, subscribed by Mrs. Van Steenberg, accompanied by a draft of $180 payable to the

*3. Principal and agent: sale of corporate stock: rights of agent.*

treasurer, and another order for five hundred shares sub-
scribed for by Larson, accompanied by a draft for $200
payable to the treasurer were received, Steele had no au-
thority whatever to appropriate them to his own use, and
instead of issuing treasurer's stock to substitute that which
he had purchased of Crabtree's son.    Even if as he con-
tends, he was to dispose of the stock to be issued to him
as compensation for his services through the agencies of the
company, this did not give him authority to make use of such
agencies for the sale of stock which he might purchase
for the purposes of speculation.    Nor do the circumstances
under which Larson's subscription was obtained indicate that
the draft did not belong to the company.    Crabtree had sent
a prospectus to him, and followed this by a letter January
3, 1903.    Thereafter, Miss Erwin wrote to her brother to
see Larson, which he did, and reported that the order would
be sent in, though Larson did not then subscribe.    There-
after, on the 19th of the same month, he forwarded the order
with the remittance to Crabtree as treasurer in the supposi-
tion that he was buying treasury stock.    At whose solicita-
tion the subscription was obtained does not appear.    Evi-
dently Miss Erwin acquired the information concerning Lar-
son from having written the letter for Crabtree, and as she
was in the employment of the company, and therefore might
not interfere with its business in carrying out any personal
project, it should be assumed that the draft was obtained
through the agencies of the company.    Moreover, the em-
ployment of such agencies for any private enterprise on the
part of Steele or Miss Erwin was entirely inconsistent with
their employment, and they had no right whatever to use
these for the purpose of speculating in stocks, nor to do
anything else save the business they were employed to do.
The appropriation of these drafts by Steele was clearly with-
out authority.    He did not even take the trouble to pay the
commission on the first, but did pay that on the sale to

Larson. This should be deducted therefrom, and $330 charged to him.

It also appears that Steele paid from the company's funds $16 for his own office rent. His explanation of this is that the office was occupied by employés of the company on several occasions, and that he was compelled to borrow the use of a neighboring office two or three times. No pretense is made that any expense was incurred in so doing. In no instance was his office shown to have been thus occupied for a longer period than a couple of days. Under the original agreement, he was to make use of both offices and did so. He had never mentioned this charge to Crabtree, and there is no entry on the books indicating such a charge, save that it might be detected by ascertaining that rent for two months longer than the company had occupied its room had been paid. His explanation was evidently an afterthought, and the charge erroneously entered.

4. ACCOUNTING BY AGENT.

A draft of $10 was cashed by Steele, and used for himself. No charge was entered on the books. The only explanation offered is that he took it. This was used in settling a personal transaction between himself and Crabtree. What this was is not disclosed, and the explanation is entirely too indefinite. Having appropriated the company's money, the burden was upon him to prove, not merely to suppose, that he had repaid it. Again, out of a draft of $83.05, received July 6, 1903, Steele retained $55 for his own use. He explained that $8.22 of this was kept in payment of the balance of his expenses to Sioux Falls the year previous, and that the remainder was in payment of expenses incurred in going to the Black Hills in 1901. He had paid for his ticket by check, and there is no showing whatever of the nature of the expenses or anything indicating that the company should be charged therewith. He should have been required to turn over $47.78 of this item. A draft of $135 was received December 12, 1900. It was cashed, and but

$60 deposited in the bank.   The remaining $75 was used
by Steele in the payment of a note at the Marquardt Savings
Bank, and to take up certain tax certificates held by that
bank as collateral security.   He furnished no proof that this
money had ever been returned, saying, " I cannot point out
where this $75 is."   He should be charged with this item,
and all others mentioned, with interest at 6 per cent. per
annum on each from the time appropriated.   In several
other instances, the explanation given is not entirely satis-
factory, but in view of the state of the record, we are not
inclined to disturb the findings of the district court with ref-
erence thereto.   Only those items which we find should be
charged to Steele have been discussed, as it would be imprac-
ticable to take up all of those concerning which there is any
dispute.   Evidence has been referred to merely to indicate
the ground of our conclusion, and no attempt made at a full
discussion of the various features contained in this very
voluminous record.

We conclude that the decree was erroneous, and that
judgment should have been entered against the defendant as
already indicated.   The cause will be remanded for decree
in the district court, or, at plaintiff's election, may be entered
here.— *Reversed.*